IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JERRY LANCE PETTY, | § | |
| *Plaintiff* | § | |
| v. | § | |
| CITY OF FREEPORT, TEXAS and JEFFREY MICHAEL PEÑA, in his individual capacity and, for injunctive relief, in his official capacity, | § § § § | CIVIL ACTION NO. 3:25-cv-296 |
| *Defendants* | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jerry Lance Petty files this First Amended Complaint against Defendants City of Freeport, Texas and Jeffrey Michael Peña and alleges as follows:

## I. Introduction

1. Plaintiff Jerry Lance Petty is the former City Manager of Freeport, Texas. This case arises from Defendants' termination of Plaintiff, their public dissemination and ratification of stigmatizing accusations against him, their refusal to provide a constitutionally adequate name-clearing process, their retaliation against Plaintiff based on protected citizen speech by Plaintiff's spouse and Plaintiff's refusal to suppress or distance himself from that speech, and the City's refusal to honor Plaintiff's written Employment Agreement.

2. Plaintiff does not claim that the City Charter gave him an absolute right to remain City Manager indefinitely. The City could remove him from office. But once the City chose to terminate him, Plaintiff had separate contractual entitlements under his City-approved Employment Agreement, including accrued benefits and a $50,000 severance payment unless the City validly terminated him for cause under the Agreement's notice, cause, and supermajority requirements. The City deprived Plaintiff of those economic entitlements by labeling the termination "for cause" without reasonable written notice of the contractual cause asserted, without establishing that the alleged conduct satisfied the Agreement's definition of cause, without giving Plaintiff a meaningful opportunity to respond, and without the required supermajority vote.

3. Plaintiff further alleges that Defendants publicly connected his termination to false and stigmatizing accusations of criminal and professional misconduct, including allegations involving an alleged assault, an alleged conspiracy to commit murder against a councilmember, an allegedly illegal suspension of the Police Chief, and alleged "grift." Defendants did so despite prior law-enforcement determinations that the relevant recordings reflected no credible threat.

4. Plaintiff also alleges that Councilmember Peña retaliated against him because Plaintiff's spouse, Amanda Gayle Petty, engaged in protected citizen

speech and civic participation concerning Freeport city affairs, Councilmember Peña's public Facebook broadcasts, and Peña's treatment of Mayor Jerry Cain and Councilmember George Matamoros, including Peña's public statements calling them "perverts." Peña expressly linked Plaintiff's public employment position to Amanda Petty's Concerned Citizens of Freeport ("CCF") and social-media activity when he warned Plaintiff that Amanda should not be part of CCF and should not release anything on social media.

5. Plaintiff seeks damages, declaratory relief, prospective injunctive relief, attorney's fees, costs, and all other relief allowed by law.

## II. Parties

6. Plaintiff Jerry Lance Petty is a Texas resident and the former City Manager of Freeport, Texas.

7. Defendant City of Freeport, Texas is a Texas home-rule municipality. The City may be served by serving the City Secretary at 1201 North Avenue H, Freeport, Texas 77541.

8. Defendant Jeffrey "Jeff" Michael Peña is an elected Freeport City Councilmember. He is sued in his individual capacity and, for prospective relief only, in his official capacity. Jeffrey Michael Peña may be served at 224 West Park Avenue, Apt. 200, Freeport, Texas 77541.

## III. Jurisdiction and Venue

9. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution.

10. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as Plaintiff's federal claims.

11. Plaintiff's breach-of-contract claim against the City also arises under Texas Local Government Code § 271.152, which waives governmental immunity for written contracts for services entered into by a local governmental entity.

12. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims occurred in Brazoria County, Texas, within the Galveston Division of the Southern District of Texas.

## IV. Discovery Control Plan

13. Discovery in this matter should be conducted under the Federal Rules of Civil Procedure, including Rules 26 through 37, the Local Rules of the Southern District of Texas, and any scheduling order entered by the Court.

## V. Factual Allegations

### A. Plaintiff's Appointment and Employment Agreement

14. On or about December 13, 2023, Plaintiff was appointed City Manager for the City of Freeport pursuant to a written Employment Agreement approved by the City Council. Exhibit D.

15. The Employment Agreement was approved as to form by the City Attorney, approved by the City Council, signed by the Mayor on behalf of the City, and signed by Plaintiff. The City paid Plaintiff under the Employment Agreement, provided benefits under it, and later relied on or discussed the Agreement in connection with Plaintiff's termination.

16. The Employment Agreement expressly distinguished the City Council's authority to remove Plaintiff from office from Plaintiff's contractual entitlement to severance and accrued benefits. The Agreement provided that the City Council could terminate Plaintiff's services at any time, with or without cause, but that authority was subject to the Agreement's terms governing contractual severance and accrued benefits.

17. The Employment Agreement created separate procedures for termination without cause and termination for cause. Termination without cause required thirty days' prior written notice and was subject to payment of contractual

severance. Termination for cause required reasonable written notice and an affirmative supermajority vote of all members of the City Council.

18. The Employment Agreement provided that Plaintiff would receive $50,000.00 in severance if he was involuntarily terminated or terminated without cause while willing and able to perform his duties, but that he would not receive severance if validly terminated for cause.

19. The Employment Agreement defined “cause” to include breach of the Agreement; willful, knowing, or grossly negligent failure to perform a required duty; misappropriation of City assets; certain convictions, probation, deferred adjudication, or deferred disposition involving specified misconduct; falsification of City records; or a court order restraining, preventing, or otherwise impairing Plaintiff’s ability to perform his duties.

20. The City did not give Plaintiff written notice identifying any specific contractual “cause” category it claimed applied. Nor did the City establish that Plaintiff breached the Agreement, willfully, knowingly, or grossly negligently failed to perform a required duty, misappropriated City assets, was convicted of a qualifying offense, falsified City records, or became subject to a court order impairing his ability to perform.

21. The City may have had the power to remove Plaintiff as City Manager, but it did not have the power to deprive him of severance and accrued contractual

benefits by applying an unsupported "for cause" designation without satisfying the Agreement's notice, cause, and supermajority requirements.

22. Plaintiff's property-interest theory does not depend on an absolute right to remain City Manager indefinitely. Rather, Plaintiff alleges that the Employment Agreement created a distinct entitlement to contractual termination benefits, including severance and the contractual classification procedures governing whether a termination was with or without cause.

23. The City could remove Plaintiff from office under the Charter, but it could not deprive Plaintiff of his contractual severance entitlement by labeling the termination "for cause" without reasonable written notice, evidence establishing contractual cause, and a meaningful opportunity to respond.

B. Councilmember Peña's Direct Contact with Staff and Administrative Conduct

24. Beginning in or about 2023 and continuing thereafter, Councilmember Peña met with City staff outside the City Manager chain of command, requested internal spreadsheets and contracts, commented on personnel matters, and attempted to direct or influence City employees outside the organizational hierarchy.

25. Peña's conduct included administrative and executive actions, not merely legislative deliberation. His conduct included directing or attempting to direct staff, threatening Plaintiff's continued employment based on Plaintiff's

spouse's speech and civic participation, publishing edited or misleading materials and using official-branded channels to advance accusations about Plaintiff. (Exhibit C, NCF-C).

26. Peña's conduct was taken outside the deliberative lawmaking process and under color of state law.

27. On or about December 18, 2024, Councilmember Peña recorded a video with Finance Director Ashlee Hurst at City Hall. (Exhibit A, NCF-A). Immediately thereafter, he recorded a second video in which he told Plaintiff he would ask for Plaintiff's resignation, demanded that RFPs be released that day, and asserted that Plaintiff was concealing information. (Exhibit B, NCF-B).

28. Plaintiff and City staff prepared memoranda in late 2024 documenting direct contact by Councilmember Peña with the Police Chief and others, including a statement that Peña would "come down hard" on Plaintiff and that the Chief should be prepared to act in Plaintiff's place.

C. Amanda Petty's Protected Citizen Speech and Civic Association

29. Plaintiff's spouse, Amanda Gayle Petty, was a private citizen and was not employed by the City.

30. In early December 2023, Amanda Petty engaged in protected citizen speech and civic association concerning matters of public concern in Freeport.

31. Specifically, on October 2, 2023, Amanda Petty made the following comments on Facebook's social media. "Another day, another slander attack on my family. Another round of lies and false claims. This time Lance is attacked for 'cover up and abuse'…Of course again without evidence, or any kind of factual statements, or even a veiled reference. Just baseless accusations. And then mentions about contracts, Lance isn't over contracts. Lance approves 0% of contracts. The city council approves (or doesn't) contracts." Additionally,

on or about early December 2023, Amanda Petty made written comments on Facebook, including in or in connection with Concerned Citizens of Freeport ("CCF") discussions, criticizing Councilmember Jeff Peña's Facebook broadcasts and his treatment of Mayor Jerry Cain and Councilmember George Matamoros.

32. Amanda Petty criticized Peña for publicly calling Mayor Cain and George Matamoros "perverts," a charge Amanda considered alarming and inappropriate because both men were fathers of young children.

33. Amanda Petty's speech concerned the conduct of elected officials, public accusations by one City councilmember against other City officials, the tone and ethics of local government, the functioning of City government, City affairs, and civic governance.

34. Amanda Petty's speech was citizen speech on matters of public concern, not speech made as a City employee and not a purely private employment grievance.

35. Amanda Petty's speech was directed at members of the Freeport community, people participating in or following CCF and/or related social-media discussions, and others interested in Freeport civic affairs.

36. Peña knew that Amanda Petty was involved in public discussion of City affairs through CCF and/or social media.

37. On or about December 20, 2023, at approximately 9:30 a.m., an audio recording captured Peña warning Plaintiff about Amanda Petty's speech and civic participation. (Exhibit C, NCF-C).

38. During that recorded conversation, Peña told Plaintiff that he intended to expose matters at City Hall, City Council, and CCF; stated that he knew Plaintiff's wife was involved with CCF; recommended that Amanda not be part of CCF and not release anything on social media; and warned that, because Plaintiff held an elevated position, Plaintiff "might want to weigh that." The City Councilman's criticism of Amanda Petty's speech continued unabated throughout Plaintiff's tenure.

39. Peña's statement linked Amanda Petty's protected citizen speech and civic association to Plaintiff's public employment.

40. Peña's statement also conveyed that Plaintiff's employment environment and standing as City Manager could be affected by Amanda Petty's speech, social-media activity, and civic association.

41. Peña's statements were made by an elected councilmember to the newly appointed City Manager, referenced Plaintiff's public employment position, and concerned Plaintiff's spouse's speech and participation in civic affairs.

42. Plaintiff had a protected First Amendment interest in refusing to suppress or control Amanda Petty's citizen speech and civic participation.

43. Defendants had no legitimate governmental efficiency interest in conditioning Plaintiff's employment on Amanda Petty's silence, social-media restraint, or withdrawal from civic activity. Amanda Petty was not a City employee.

44. Peña's conduct would chill a person of ordinary firmness from engaging in protected speech, associating with civic groups, supporting a spouse's protected speech, or refusing to silence a spouse's protected speech.

D. Recordings, Law-Enforcement Review, and Peña's Public Accusations

45. The dispute later included recordings that Peña asserted reflected serious wrongdoing by Plaintiff, including an alleged conspiracy against Peña.

46. According to Plaintiff, the Texas Rangers and the Brazoria County District Attorney reviewed the relevant audio recordings and concluded that the recordings reflected no credible threat by Plaintiff.

47. Both agencies communicated their conclusions directly to Police Chief Jennifer Howell, who then informed Peña.

48. Despite having been informed that law-enforcement authorities found no threat, Peña rejected those determinations.

49. Peña publicly insisted that the authorities were wrong and published edited excerpts of the recording and related video on social-media accounts branded as official City Council or Ward A channels. (NCF-E, NCF-F, NCF-G, NCF-H, NCF-I, NCF-J, NCF-K, NCF-L).

50. Peña's publications portrayed Plaintiff as dangerous, dishonest, corrupt, professionally unfit, and involved in serious criminal or quasi-criminal conduct.

51. Peña's publications included edited or excerpted audio and video materials that created a false and defamatory impression about Plaintiff.

52. After Peña posted the audio publicly, the Texas Rangers reinvestigated and again concluded that no credible threat had been made. Exhibit AB.

53. Peña nevertheless continued to publish statements, recordings, videos, and commentary portraying Plaintiff as having engaged in criminal, corrupt, or professionally disqualifying conduct.

E. Police Chief Investigation, Agenda Items, and Escalating Campaign Against Plaintiff

54. Within weeks of Peña's publications, several officers filed complaints regarding Police Chief Jennifer Howell. Exhibit K.

55. At the direction of Mayor Jerry Cain and with agreement from outside counsel, Plaintiff, who had formal authority to execute the action, suspended Chief Howell with pay pending an investigation.

56. The suspension lasted approximately two months.

57. The investigation of Chief Howell closed with no finding of misconduct after the complaining officers withdrew their complaints on or about June 2, 2025. (Exhibit Q, Exhibit R).

58. On or about June 2, 2025, Peña made public accusations through a City-branded Facebook page that the Police Chief's suspension had been illegal, even though Plaintiff had acted in response to direction from Mayor Cain and the City Attorney. NCF-D.

59. Peña also accused Plaintiff and others of "grift."

60. Although Peña himself maintained a suit against the City (Exhibit O, Exhibit X), Peña and Councilmember Jarvis Davis requested agenda items concerning Plaintiff, including matters concerning Plaintiff's retention of personal legal counsel and alleged misconduct. (Exhibit S, Exhibit V, Exhibit W).

61. Mayor Cain and Councilmember Matamoros later requested an agenda item concerning a resolution of censure against Peña for, among other things, responding to a demand letter in a manner that did not represent the position of the majority of Council and repeated Charter violations involving City staff. Exhibit U.

62. The issue of Peña's conduct was tabled and not meaningfully corrected by the City.

63. The City had actual notice of concerns regarding Peña's conduct, including memoranda, agenda items, censure discussions, complaints concerning Charter violations, and public controversy surrounding his communications with staff and official-branded publications. (Exhibit E, Exhibit F, Exhibit G, Exhibit H, Exhibit I, Exhibit J, Exhibit M, Exhibit N, Exhibit T).

64. The City failed to stop, correct, repudiate, or meaningfully discipline Peña's conduct.

65. Instead, after Peña's campaign of public accusations, the City Council terminated Plaintiff.

F. Plaintiff's June 11, 2025, Termination

66. On or about June 11, 2025, Peña convened or participated in a Special Meeting of the City Council to discuss Plaintiff's employment. Exhibit L.

67. The agenda included an item to deliberate the employment, evaluation, discipline, or dismissal of City Manager Lance Petty as related to the investigation report concerning Chief Jennifer Howell.

68. The agenda did not give Plaintiff meaningful notice that Defendants would accuse him of assault, conspiracy to commit murder, criminal threats, grift, dishonesty, illegal suspension of the Police Chief, or other stigmatizing misconduct as the basis for discharge.

69. Plaintiff did not receive reasonable written notice of the specific charges asserted as "cause" under the Employment Agreement.

70. Plaintiff did not receive timely access to the materials, recordings, edited excerpts, evidence, or alleged facts used to support a for-cause termination classification.

71. Plaintiff was not given a meaningful pre-termination opportunity to respond to the specific charges or to contest the "for cause" classification.

72. Plaintiff understood the June 11, 2025, proceeding to be ordinary policy debate and did not receive an invitation or instruction to present evidence to clear his name.

73. Before the termination vote, Mayor Cain questioned City Attorney David Olson concerning the Employment Agreement's supermajority requirement.

74. The City Attorney stated in substance that the supermajority provision did not matter because the City Charter required only a majority.

75. The City Council then terminated Plaintiff by a 3-1 vote, with one councilmember absent.

76. The City recorded the termination as "for cause."

77. The City's "for cause" designation prevented Plaintiff from receiving the $50,000 severance payment to which he was contractually entitled if terminated without cause.

78. The City did not establish contractual cause before depriving Plaintiff of the severance entitlement.

79. The City's "for cause" classification was the operative deprivation of Plaintiff's severance and termination-benefit property interest.

G. Public Dissemination of Stigmatizing Charges and Name-Clearing Request

80. Defendants publicly connected Plaintiff's termination to accusations of serious criminal and professional misconduct, including allegations that Plaintiff was involved in an alleged assault, an alleged conspiracy to commit murder against a councilmember, an allegedly illegal suspension of the Police Chief, grift, dishonesty, and professional unfitness. (NCF-E, NCF-F, NCF-G, NCF-H, NCF-I, NCF-J, NCF-K, NCF-L).

81. Those accusations were false.

82. Before Plaintiff's termination, the Texas Rangers and Brazoria County District Attorney had reviewed the relevant audio and concluded that the recordings reflected no credible threat.

83. After Peña later publicized portions of the recordings, the Texas Rangers again reviewed the matter and again concluded that no credible threat had been made. Exhibit AB.

84. Peña knew, before publishing or republishing the accusations, that law-enforcement authorities had rejected the allegation that Plaintiff made a threat.

85. Peña nevertheless published edited excerpts of audio and video on social-media accounts branded as official City Council or Ward A channels.

86. Those publications were repeated, amplified, or reported in local media and tied Plaintiff's termination to allegations of criminal or quasi-criminal conduct.

87. Within approximately twenty-four hours after Plaintiff's termination, the stigmatizing charges were published in the local newspaper and publicly connected to Plaintiff's discharge.

88. Plaintiff did not receive a meaningful public hearing before discharge.

89. Plaintiff was not provided the specific stigmatizing charges, the materials to be used against him, or a meaningful public opportunity to refute the accusations before the City Council terminated him for cause.

90. After the stigmatizing charges were publicly disseminated and after Plaintiff learned the public scope of the accusations, Plaintiff, through counsel, requested an opportunity to clear his name.

91. Specifically, on or about June 19, 2025, Plaintiff's counsel, Clay Thomas, spoke by telephone with Mayor Jerry Cain and requested that the City provide Plaintiff a public name-clearing opportunity to respond to the accusations that had been publicly tied to his termination, including accusations of criminal threats, conspiracy, illegal suspension of the Police Chief, grift, dishonesty, and professional unfitness. Counsel requested that Plaintiff be allowed to address and correct the public record concerning the reasons for his termination.

92. Mayor Cain denied or rejected the request in substance, stating that the Council's decision was final and that the City would not revisit the matter. The City did not place a name-clearing hearing on an agenda, did not provide Plaintiff with a public opportunity to respond to the stigmatizing charges, and did not correct or supplement the public record.

93. No public name-clearing hearing was scheduled.

94. No opportunity was provided for Plaintiff to confront or respond publicly to the charges.

95. The City did not correct the public record.

96. Plaintiff was left with public records, public statements, and public reporting tying his discharge to false accusations of criminal conduct, corruption, dishonesty, and professional unfitness.

H. Post-Termination Employment Harm and Continuing Publications

97. After Plaintiff's termination, the City appointed Police Chief Howell as Interim City Manager.

98. From June 2025 through at least July 2025, Peña posted edited audio and video on official-branded social-media pages or websites, claiming or implying that Plaintiff had engaged in wrongdoing. (Exhibit Y, Exhibit Z, NCF-E, NCF-F, NCF-G, NCF-H, NCF-I, NCF-J, NCF-K, NCF-L).

99. Peña continued to publish statements and videos to official-branded accounts, including statements characterizing Plaintiff as involved in serious criminal, corrupt, or professionally disqualifying conduct.

100. On or about August 2025, Peña filmed Plaintiff's new place of employment, Turbeville Construction, and published content on his City-branded Facebook page subjecting Plaintiff and his new employer to public accusations and ridicule.

101. Peña falsely suggested that Plaintiff was involved in an "illegal grift" concerning Turbeville Construction and the potential sale of City Hall. (NCF-J, NCF-K).

102. Plaintiff denies that he engaged in any such grift or wrongdoing.

103. Plaintiff had not met James Turbeville before an employment interview that occurred after Plaintiff's dismissal.

104. Plaintiff lost or was damaged in connection with prospective employment opportunities, including positions such as City Administrator for Clyde, Texas; City Manager for Santa Fe, Texas; City Manager for Llano, Texas; and Assistant General Manager of the Brazosport Water Authority. For each of these entities,

Plaintiff was interviewed and was chosen as a finalist for the position. Exhibit AA.

105. Plaintiff ultimately accepted employment at Turbeville Construction at substantially lower compensation than his City Manager compensation and without comparable benefits.

106. Plaintiff suffered lost wages, lost benefits, diminished earning capacity, reputational harm, emotional distress, and out-of-pocket losses.

## VI. Causes of Action

### Count 1 — Procedural Due Process: Deprivation of Contractual Property Interest in Severance and Termination Benefits, 42 U.S.C. § 1983 — Against the City and Peña

107. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

108. Plaintiff does not allege that the City Charter gave him an absolute property interest in continued employment as City Manager. Rather, Plaintiff alleges that the Employment Agreement created a legitimate claim of entitlement to contractual termination benefits, including accrued compensation, accrued benefits, and $50,000 in contractual severance unless the City validly terminated him for cause under the Agreement.

109. The Agreement made the loss of severance turn on a valid for-cause termination. To validly terminate Plaintiff for cause, the Agreement required

reasonable written notice, contractual cause as defined in the Agreement, and an affirmative supermajority vote of all City Council members.

110. The City deprived Plaintiff of that protected entitlement by classifying the termination as "for cause" without reasonable written notice identifying the specific contractual cause asserted, without establishing facts satisfying the Agreement's definition of cause, without giving Plaintiff a meaningful opportunity to respond, and without the required supermajority vote.

111. The City did not give Plaintiff written notice identifying any specific contractual "cause" category it claimed applied. Nor did the City establish that Plaintiff breached the Agreement, willfully, knowingly, or grossly negligently failed to perform a required duty, misappropriated City assets, was convicted of a qualifying offense, falsified City records, or became subject to a court order impairing his ability to perform.

112. Plaintiff alleges that, once the City exercised its removal power, the City could not deprive him of contractual termination benefits and severance by designating his termination "for cause" without constitutionally adequate process.

113. Even if the City Charter permitted the Council to remove Plaintiff from office by majority vote, the Charter did not authorize the City to avoid the Agreement's severance and accrued-benefit obligations by unilaterally

labeling the termination "for cause" without satisfying the Agreement's contractual requirements for cause.

114. The Agreement required reasonable written notice and an affirmative supermajority vote of all members of the City Council before a termination for cause.

115. The Agreement created, at minimum, a legitimate claim of entitlement to the contractual termination benefits, procedures, and classification set out in the Agreement, including the right not to be deprived of the economic and reputational consequences of a "for cause" termination unless the City complied with the Agreement's notice, cause, and voting requirements.

116. Plaintiff's entitlement to severance and termination benefits became fixed when the City terminated him without first establishing contractual cause through the required process.

117. The City's "for cause" designation was the operative deprivation because it extinguished Plaintiff's $50,000.00 severance entitlement and related contractual termination benefits.

118. Defendants deprived Plaintiff of that property interest without due process by terminating him for cause without reasonable written notice of the specific charges, without timely access to the materials used against him,

without a meaningful opportunity to respond, and without the contractual supermajority vote.

119. Plaintiff was not provided notice that the City intended to adjudicate contractual cause in a manner that would deprive him of his severance entitlement.

120. Plaintiff was not provided disclosure of the facts, recordings, edited excerpts, or materials supporting the “for cause” designation.

121. Plaintiff was not provided a meaningful opportunity to contest the “for cause” classification before it was made.

122. The City Council’s termination decision and “for cause” classification were acts of the City’s governing body and final policymaker for the employment action and deprivation at issue.

123. The City is liable because the deprivation was caused by the City Council’s final-policymaker decision.

124. Peña is liable because he participated outside the legislative process, directed staff, published edited materials, used official-branded channels to advance false charges, and acted under color of state law to cause the deprivation.

125. Plaintiff seeks nominal damages, compensatory damages where available, attorney's fees, costs, and equitable relief for this constitutional deprivation.

126. In the alternative, to the extent the Court determines that the Employment Agreement creates only state-law contractual rights and not a federal constitutional property interest, Plaintiff preserves his breach-of-contract claim and related state-law remedies.

**Count 2 — Procedural Due Process: Liberty Interest / Stigma-Plus / Name-Clearing Hearing, 42 U.S.C. § 1983 — Against the City and Peña**

127. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

128. Plaintiff was discharged from public employment on June 11, 2025.

129. Defendants made and disseminated stigmatizing charges in connection with Plaintiff's discharge.

130. Those charges included accusations that Plaintiff engaged in or was connected to an alleged assault, an alleged conspiracy to commit murder against a councilmember, an allegedly illegal suspension of the Police Chief, grift, dishonesty, and other conduct rendering Plaintiff professionally unfit for public employment.

131. The charges were false.

132. Law-enforcement authorities reviewed the recordings at issue and concluded that Plaintiff made no credible threat. Exhibit AB.

133. The investigation of Chief Howell closed without a finding of misconduct after the complaints were withdrawn.

134. The charges were made public.

135. Peña published edited audio and video excerpts on official-branded social-media accounts.

136. Local media reported that Plaintiff had been fired over an alleged murder plot or similar serious allegations.

137. City officials and City-related publications publicly tied Plaintiff's termination to the accusations.

138. No meaningful public hearing was conducted before Plaintiff's discharge.

139. Plaintiff was not provided the specific stigmatizing charges, the materials to be used against him, or a meaningful public opportunity to refute the accusations before the City Council terminated him for cause.

140. After the stigmatizing charges were publicly disseminated and after Plaintiff learned the public scope of the accusations, Plaintiff, through counsel, requested an opportunity to clear his name through a name-clearing hearing.

141. The request was made during a telephone conversation with Mayor Jerry Cain concerning clearing Plaintiff's name from the accusations publicly connected to the termination.

142. Mayor Cain denied or rejected the request in substance by stating that the Council's decision was final.

143. The City failed to schedule a name-clearing hearing, failed to respond to the name-clearing request after the original request, failed to provide Plaintiff with a public opportunity to respond to the charges, and failed to correct the public record.

144. The denial or failure to provide a meaningful name-clearing process caused constitutional injury because Plaintiff was left publicly branded with false accusations of criminal conduct, corruption, dishonesty, and professional unfitness without a public opportunity to clear his name.

145. The City is liable because the relevant actions were taken by the City Council, the City's governing body and final policymaker for Plaintiff's termination and any name-clearing hearing following that termination.

146. Peña is liable because he personally published and republished the stigmatizing charges and used official-branded channels under color of law to create and perpetuate the stigma.

147. Plaintiff seeks nominal damages, compensatory damages where available, attorney's fees, costs, and equitable relief requiring a constitutionally adequate name-clearing hearing and correction of stigmatizing records.

**Count 3 — First Amendment Retaliation Based on Amanda Petty's Protected Citizen Speech and Plaintiff's Refusal to Suppress That Speech, 42 U.S.C. § 1983 — Against the City and Peña**

148. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

149. Amanda Petty engaged in protected citizen speech and civic association concerning matters of public concern.

150. In early December 2023, Amanda Petty made written comments on Facebook, including in or in connection with Concerned Citizens of Freeport ("CCF") discussions, criticizing Councilmember Peña's Facebook broadcasts and his treatment of Mayor Cain and Councilmember George Matamoros.

151. Amanda criticized Peña for publicly calling Mayor Cain and George Matamoros "perverts," a charge Amanda considered alarming and inappropriate because both men were fathers of young children.

152. Amanda's speech addressed matters of public concern because it concerned local government, City Hall, City Council, CCF, public ethics, public accusations by an elected official, official conduct, civic governance, and the treatment of public officials in public broadcasts.

153. Amanda Petty's speech was made as a private citizen and not pursuant to any City employment duties.

154. Plaintiff also had a protected First Amendment interest in supporting, associating with, and refusing to suppress his spouse's citizen speech and civic participation.

155. Peña knew of Amanda Petty's involvement in public discussion of City affairs through CCF and/or social media.

156. Peña expressly connected Plaintiff's employment position to Amanda Petty's speech and civic association.

157. On or about December 20, 2023, Peña told Plaintiff that he intended to expose matters at City Hall, City Council, and CCF; stated that he knew Plaintiff's wife was involved; recommended that Amanda not be part of CCF and not release anything on social media; and warned that because Plaintiff held an elevated position, Plaintiff "might want to weigh that."

158. Peña's warning was directed at Plaintiff in his capacity as City Manager and was tied to Amanda Petty's CCF/social-media speech and civic participation.

159. Peña's statement constituted pressure on Plaintiff to silence, control, or distance himself from Amanda Petty's protected speech and civic participation.

160. Peña's December 2023 warning was the beginning of a continuing course of retaliatory hostility toward Plaintiff arising in part from Amanda Petty's protected speech and CCF involvement. After Amanda Petty's speech and Peña's warning, Peña continued to press issues involving Plaintiff's employment, sought agenda items concerning Plaintiff, and published accusations about Plaintiff.

161. Plaintiff suffered an adverse employment action when the City terminated him for cause on June 11, 2025.

162. Plaintiff also suffered adverse retaliatory acts through the public campaign of accusations, interference with employment prospects, and continued official-branded publications.

163. Amanda Petty's speech, Plaintiff's refusal or inability to silence Amanda, and Plaintiff's association with Amanda were substantial or motivating factors in Peña's actions and in the adverse employment action.

164. Plaintiff's and Amanda Petty's First Amendment interests outweighed any governmental interest in suppressing Amanda Petty's citizen speech or forcing Plaintiff to control his spouse's civic activity.

165. Amanda Petty was not a City employee, and Defendants had no legitimate efficiency interest in conditioning Plaintiff's public employment on her silence.

166. Defendants' actions would chill a person of ordinary firmness from engaging in protected speech, associating with civic organizations, supporting a spouse's protected speech, or refusing to suppress a spouse's protected citizen speech.

167. The City is liable because the City Council, acting as final policymaker, terminated Plaintiff after Peña's retaliatory campaign and because the City ratified or adopted the retaliatory use of official-branded channels and allegations as part of the termination process.

168. Peña is liable because he personally threatened, pressured, published, advocated and retaliated against protected speech and association.

169. Plaintiff seeks compensatory damages, nominal damages, punitive damages against Peña where permitted, attorney's fees, costs, and appropriate equitable relief.

**Count 4 — Municipal Liability Under Monell, 42 U.S.C. § 1983 — Against the City**

170. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

171. The City is liable under Monell because the constitutional violations alleged above were caused by official policy, final-policymaker action, ratification, and/or a persistent practice so common and well settled as to constitute municipal custom.

172. The City Council was the final policymaker for terminating Plaintiff, stating the reasons for termination, determining whether to provide a name-clearing hearing, and deciding whether to correct or preserve stigmatizing official records. Sec. 3.07. – "Powers of the city council. The determination of all matters of policy and the exercise of all powers of local self-government shall be vested in the city council. By way of illustration, but not limitation, the following enumerated powers are among these powers that may be exercised by the city council: (a) Power to remove from office in city government, any officer or member of any board or commission but shall not have the authority to remove any employee from the employment of the city government, except the city manager;" Freeport, Texas Code of Ordinances, Part I, Art. II, § 3.07.

173. The City Council itself terminated Plaintiff for cause in a public meeting after stigmatizing accusations had been published and connected to the termination.

174. A single decision by the City's final policymaker is sufficient to constitute municipal policy when the policymaker has final authority over the subject matter.

175. The City also maintained or tolerated a practice by which councilmembers used official-branded social-media accounts and public platforms to make unilateral public accusations concerning City affairs and personnel, despite

policies or ordinances reserving official public statements to the Mayor or City Manager.

176. The City had actual notice of Peña's conduct through memoranda, agenda items, censure discussions, complaints concerning Charter violations, public postings, and the controversy surrounding his communications with staff and official-branded publications.

177. The City nevertheless failed to stop, correct, or repudiate Peña's misuse of official-branded channels and instead terminated Plaintiff after Peña's campaign of public accusations.

178. The City's final-policymaker action, ratification, and deliberate indifference were moving forces behind the deprivation of Plaintiff's property interest, deprivation of Plaintiff's liberty interest, and First Amendment retaliation alleged above.

179. Plaintiff seeks compensatory damages, nominal damages, attorney's fees, costs, and equitable relief against the City.

**Count 5 — Breach of Contract — Against the City**

180. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

181. Plaintiff and the City entered into a written Employment Agreement approved by the City Council.

182. Plaintiff performed under the Agreement or was excused from performance.

183. The Agreement required reasonable written notice and an affirmative supermajority vote of all members of the City Council to terminate Plaintiff for cause.

184. The Agreement required thirty days' prior written notice for termination without cause and provided that Plaintiff would receive $50,000.00 in severance if terminated without cause.

185. The City breached the Agreement by terminating Plaintiff for cause without reasonable written notice of the specific charges, without establishing cause, without the contractually required supermajority vote, and without paying the severance owed for a termination that was not validly effected as a for-cause termination.

186. The City's breach caused Plaintiff damages, including the unpaid $50,000.00 severance, accrued compensation and benefits, amounts due for any required notice period, attorney's fees where recoverable, interest, and other contract damages recoverable under Texas law and Chapter 271.

187. Governmental immunity is waived under Texas Local Government Code § 271.152 because the Agreement is a written contract stating essential terms for services provided to a local governmental entity.

**Count 6 — Defamation Per Se and Per Quod — Against Peña**

188. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

189. Peña published and republished statements of fact about Plaintiff to third parties through social media, official-branded accounts, videos, public statements, and communications that were reasonably understood as factual assertions.

190. The defamatory statements included assertions or implications that Plaintiff had threatened or plotted violence against a councilmember, participated in an assault or conspiracy to commit murder, illegally suspended the Police Chief, engaged in "grift," acted dishonestly, or was professionally unfit for public employment. See Notice of Conventional Filings (NCF-D-2025-06-02 PenaJ FB Vid, NCF-E-2025-06-12-0237 PenaJ FB Vid, NCF-F-2025-06-13 PenaJ FB Vid, NCF-G-2025-06-15 PenaJ FB Vid, NCF-H-2025-06-20_1136 PenaJ FB Vid, NCF-I-2025-07-13_2010 PenaJ Vid, NCF-J-2025-08-14 PenaJ FB Vid (pt 1), NCF-K-2025-08-14 PenaJ FB Vid (pt 2), NCF-L-2025-08-21 Jeff Pena FB Vid (Pt 1)).

191. The statements were false.

192. The Texas Rangers and Brazoria County District Attorney concluded that the relevant recordings reflected no credible threat. Exhibit AB.

193. The Police Chief investigation closed without a misconduct finding after the complaints were withdrawn.

194. Plaintiff did not engage in the criminal, corrupt, or professionally disqualifying conduct Peña accused or implied Plaintiff committed.

195. Peña published the statements to persons other than Plaintiff, including the public, City constituents, media audiences, prospective employers, and viewers of Peña's official-branded social-media pages.

196. Peña acted with at least negligence as to the falsity of the statements.

197. To the extent Plaintiff is deemed a public official or limited-purpose public figure, Peña acted with actual malice because he knew or recklessly disregarded the contrary law-enforcement findings and nevertheless published edited or misleading excerpts as proof of criminal or corrupt conduct.

198. The statements were defamatory per se because they accused Plaintiff of serious criminal conduct, official misconduct, dishonesty, and professional unfitness in his occupation as a public administrator.

199. The statements were also defamatory per quod because they caused special damages, including loss of specific employment opportunities, loss of

income and benefits, diminished earning capacity, reputational harm, and emotional distress.

200. Any conditional, official, or common-interest privilege is defeated by Peña's actual malice, knowledge of falsity, reckless disregard for the truth, excessive publication, and use of edited or misleading materials.

201. Plaintiff seeks actual damages, presumed damages where permitted for defamation per se, special damages, exemplary damages upon the required showing, interest, costs, and all other relief allowed by law.

**Count 7 — Tortious Interference with Prospective Business Relations — Against Peña**

202. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

203. Plaintiff had a reasonable probability of entering into prospective employment relationships with public and quasi-public employers, including but not limited to the City of Clyde, City of Santa Fe, City of Llano, and Brazosport Water Authority. In each of these instances, the employer, during background research, discovered Peña's Facebook video publications and rejected Petty as a candidate based upon Peña's accusations.

204. Peña knew or reasonably should have known that Plaintiff would seek comparable public-administration employment after his termination and that

public accusations of criminal conduct, grift, dishonesty, and professional unfitness would foreseeably reach and influence prospective employers.

205. Peña intentionally and knowingly interfered with Plaintiff's prospective employment relationships by publishing and republishing false accusations and edited or misleading recordings to the public and to audiences likely to include prospective employers, recruiters, public officials, and community stakeholders.

206. Peña's conduct was independently tortious or unlawful because it constituted defamation, defamation per se, business disparagement, malicious falsehood, and/or misuse of official-branded channels to publish false statements.

207. Peña's interference proximately caused Plaintiff to lose specific prospective employment opportunities and to accept lower-paying employment with inferior benefits.

208. Plaintiff suffered actual damages, including lost salary, lost benefits, lost earning capacity, reputational harm, and consequential damages.

209. Plaintiff seeks actual damages, exemplary damages upon the required showing, interest, costs, and all other relief allowed by law.

**Count 8 — Intentional Infliction of Emotional Distress — Against Peña, Pled in the Alternative**

210. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

211. This count is pled in the alternative and only to the extent Plaintiff has no adequate remedy under defamation, tortious interference, constitutional, contract, or other available legal theories for the full scope of Peña's extreme and outrageous conduct.

212. Peña acted intentionally or recklessly.

213. Peña's course of conduct was extreme and outrageous because he used official-branded public platforms and his position as a councilmember to publish edited or misleading materials accusing Plaintiff of grave criminal and corrupt conduct despite contrary law-enforcement findings, continued the campaign after Plaintiff's termination, filmed Plaintiff's new workplace, and attempted to damage Plaintiff's new employment and livelihood.

214. Peña's conduct went beyond ordinary political criticism, employment dispute rhetoric, or workplace conflict because it involved repeated public accusations of serious criminality and corruption, made with knowledge of contrary official findings and directed at destroying Plaintiff's reputation and employability.

215. Peña's conduct caused Plaintiff severe emotional distress, including humiliation, anxiety, reputational distress, loss of professional standing, and continuing emotional harm caused by the public branding of Plaintiff as criminally or corruptly involved in wrongdoing.

216. Plaintiff seeks actual damages, exemplary damages upon the required showing, interest, costs, and all other relief allowed by law.

**Count 9 — Prospective Declaratory and Injunctive Relief — Against the City and Peña in His Official Capacity**

217. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

218. Plaintiff seeks prospective declaratory and injunctive relief to remedy ongoing effects of Defendants' alleged constitutional violations, including the continued absence of a public name-clearing process and the continued existence of official records or official-branded publications tying Plaintiff's termination to false and stigmatizing accusations of criminal, corrupt, dishonest, or professionally disqualifying conduct.

219. Plaintiff seeks an order requiring Defendants, or the City officials with present authority over the relevant records, agenda process, and official communications, to provide a constitutionally adequate public name-clearing hearing at which Plaintiff may respond to the stigmatizing accusations publicly connected to his termination.

220. Plaintiff further seeks prospective relief requiring preservation of native recordings, metadata, social-media posts, account data, communications, and official records concerning Plaintiff, Amanda Petty, the recordings, the termination, the stated reasons for termination, and Peña's official-branded publications.

221. Plaintiff seeks correction, supplementation, or removal of specific official City records or City-controlled official-branded publications that state or imply Plaintiff was terminated for criminal, corrupt, dishonest, or professionally disqualifying conduct, to the extent such records or publications remain under City control and are found to be false, stigmatizing, or constitutionally deficient.

222. Plaintiff does not seek retrospective money damages through this count.

223**.** To the extent the Court determines that additional or different officials are necessary to provide complete prospective relief, Plaintiff requests leave to name the City officials with present legal authority over the requested relief, including the Mayor, City Secretary, City Manager, records custodian, communications custodian, or other appropriate official custodian of City records, agendas, and official communications.

**VII. Injury and Damages**

224. Plaintiff has suffered lost wages and benefits, loss of earning capacity, loss of employment opportunities, out-of-pocket expenses, reputational harm, humiliation, and emotional distress, in amounts to be proven at trial.

225. Plaintiff seeks recovery of the $50,000.00 contractual severance and other contract damages recoverable under Texas law.

226. Plaintiff seeks nominal damages for constitutional violations.

227. Plaintiff seeks compensatory damages for back pay, front pay for a reasonable period into the future, lost benefits, reputational harm, emotional distress, and diminished earning capacity.

228. Plaintiff seeks punitive or exemplary damages against Peña where permitted by federal and state law.

229. Plaintiff also seeks reinstatement where legally and practically available or, in the alternative alternatively, front pay.

230. Plaintiff seeks attorney's fees and costs under 42 U.S.C. § 1988 and all other applicable law.

**VIII. Immunity Not Applicable**

**A. Qualified Immunity**

231. Peña is not entitled to qualified immunity.

232. The constitutional rights asserted herein, including the right to due process before deprivation of a protected property interest, the right to a name-clearing hearing when stigmatizing charges accompany termination, and the right to be free from retaliation based on protected speech and association, were clearly established at the time of Defendants' conduct.

233. No reasonable official could have believed that using official authority and official-branded channels to pressure a public employee to suppress his spouse's protected citizen speech, publish knowingly false stigmatizing accusations, and participate in a termination that deprived Plaintiff of protected interests without process was lawful.

**B. Legislative Immunity**

234. Peña is not entitled to legislative immunity for the conduct alleged herein.

235. Peña's conduct, including directing or attempting to direct staff, publishing edited recordings, threatening Plaintiff based on his spouse's civic participation, using official-branded channels to advance accusations, and interfering with Plaintiff's employment prospects, was administrative, executive, and personal conduct, not integral to any deliberative legislative function.

236. Peña's conduct was undertaken unilaterally, outside the lawmaking process, and under color of state law.

**C. Actual Malice and Punitive Damages**

237. Peña acted with actual malice and reckless disregard for the truth in publishing knowingly false or misleading accusations against Plaintiff.

238. Peña continued to publish and republish accusations after law-enforcement authorities had determined that the relevant recordings reflected no credible threat.

239. Plaintiff seeks punitive damages against Peña in an amount sufficient to punish and deter such misconduct, as authorized by federal and state law.

**D. City Ratification and Final-Policymaker Action**

240. The City is independently liable under Monell because the City Council acted as the final policymaker in terminating Plaintiff, classifying his termination as for cause, failing to provide a name-clearing hearing, and ratifying or tolerating Peña's use of official-branded platforms.

241. The City had notice of Peña's conduct and failed to curb, correct, repudiate, or discipline it.

242. The City's final-policymaker action, ratification, and deliberate indifference were moving forces behind Plaintiff's injuries.

## IX. Requested Relief

Plaintiff respectfully requests that the Court enter judgment in his favor and award the following relief:

243. A declaration that Defendants violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

244. A declaration that the City breached Plaintiff's Employment Agreement.

245. A declaration that Plaintiff was deprived of a constitutionally adequate name-clearing process.

246. An order requiring a constitutionally adequate public name-clearing hearing.

247. An order requiring preservation of native recordings, metadata, social-media posts, social-media account data, communications, and official records concerning Plaintiff, Amanda Petty, the recordings, the termination, the stated reasons for termination, and Peña's publications.

248. An order requiring correction, supplementation, or removal of specific official City records or City-controlled official-branded publications that state or imply Plaintiff was terminated for criminal, corrupt, dishonest, or professionally disqualifying conduct, to the extent such records or publications

remain under City control and are found to be false, stigmatizing, or constitutionally deficient.

249. Reinstatement or, in the alternative, front pay.

250. Back pay, lost benefits, lost earning capacity, and other compensatory damages.

251. The unpaid $50,000.00 severance and other contract damages.

252. Damages for reputational harm, emotional distress, humiliation, and consequential losses.

253. Nominal damages for constitutional violations.

254. Punitive or exemplary damages against Peña where permitted by law.

255. Attorney's fees and costs under 42 U.S.C. § 1988 and all other applicable law.

256. Pre-judgment and post-judgment interest.

257. All further relief, at law or in equity, to which Plaintiff is justly entitled.

**X. Jury Demand**

258. Plaintiff demands a jury trial on all issues triable to a jury.

Respectfully submitted,

*/s/ Clay Dean Thomas*
**Clay Dean Thomas**

Texas Bar No. 24088520
legal@claythomaspc.com
Clay Thomas, PC
15344 West State Highway 21
Douglass, Texas 75943
Telephone: (936) 715-7144
Facsimile: (979) 773-5055

Attorney for Plaintiff Jerry Lance Petty