United States District Court
Southern District of Texas
**ENTERED**
November 20, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| JERRY LANCE PETTY, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:25-cv-00296 |
| | § | |
| CITY OF FREEPORT, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me is Defendants' motion to dismiss. *See* Dkt. 53. I recommend that the motion be granted as to Plaintiff's federal claims, and that the court decline to exercise supplemental jurisdiction over Plaintiff's state-law claims.

## BACKGROUND[1]

This dispute arises from the June 11, 2025 termination for cause of Plaintiff Jerry Lance Petty, the former City Manager for Defendant City of Freeport, Texas (the "City"). Defendant Jeffrey Michael Peña is a City Councilmember for the City.

### A. PETTY'S EMPLOYMENT AGREEMENT

The City appointed Petty as City Manager on December 13, 2023, pursuant to a written employment agreement (the "Agreement") drafted by the City Attorney and approved by City Council. The Agreement provides that Petty "may be removed at any time in accordance with the provisions of [the] Agreement and the City Charter." Dkt. 39-7 at 2. The City may terminate Petty's employment in one of two ways: (1) without cause, upon "thirty (30) days prior written notice to City Manager"; or (2) for cause, upon "an affirmative vote of a super-majority of all members of the City Council" and "reasonable written notice." *Id.* at 3. A for-cause termination is appropriate for "violations of the City's Personnel Policies." *Id.* Petty

[1] These facts are taken from Petty's first amended complaint and its attachments. *See* Dkt. 39.

is entitled to $50,000 in severance if he is terminated without cause. *See id.* at 4. If he is terminated for cause, he is entitled only "to all compensation and all accrued benefits . . . earned through the date of termination." *Id.* at 3.

### B. Amanda Petty's Speech

Petty claims that his wife's speech, his "refusal or inability to silence [his wife,] Amanda, and [his] association with Amanda were substantial or motivating factors" in his June 11, 2025 termination. Dkt. 39 at 30. Specifically, on October 2, 2023, Amanda posted on Facebook:

> Another day, another slander attack on my family. Another round of lies and false claims. This time [Petty] is attacked for 'cover up and abuse' . . . Of course again without evidence, or any kind of factual statements, or even a veiled reference. Just baseless accusations. And then mentions about contracts, [Petty] isn't over contracts. [Petty] approves 0% of contracts. The city council approves (or doesn't) contracts.

*Id.* at 9. Additionally, in December 2023, Amanda made several comments on Facebook in connection with the Concerned Citizens of Freeport ("CCF"), criticizing Peña for publicly calling Mayor Jerry Cain and Councilmember George Matamoros "perverts." *Id.*

A December 20, 2023 audio recording captured Peña allegedly threatening Petty. Petty alleges:

> Peña told [Petty] that he intended to expose matters at City Hall, City Council, and CCF; stated that he knew [Petty]'s wife was involved with CCF; recommended that Amanda not be part of CCF and not release anything on social media; and warned that, because [Petty] held an elevated position, [Petty] "might want to weigh that."

*Id.* at 10.

### C. The Recordings

One of the central facets of this case is a series of recordings that, according to Peña, "reflect a conspiracy" between Petty and the City's Chief of Police, Jennifer Howell, to murder Peña. Dkt. 39-15 at 6. Petty has attached these recordings to his first amended complaint.

According to Petty, the Texas Rangers and Brazoria County District Attorney reviewed the audio recordings at issue and "concluded that the recordings reflected no credible threat by [Petty]." Dkt. 39 at 12. Both agencies presented their findings to Chief Howell, who informed Peña of the result of the agencies' investigations. Peña publicly rejected the agencies' conclusions and, beginning in June 2025, published excerpts of the recordings "on social-media accounts branded as official City Council or Ward A channels." *Id.* After Peña posted the audio recordings publicly, the Texas Rangers conducted a second investigation "and again concluded that no credible threat had been made." *Id.*

### D. Petty's Termination and Aftermath

On June 11, 2025, City Council held a Special Meeting. The Special Meeting's Agenda included an item "to deliberate the employment, evaluation, discipline, or dismissal of the City Manager Lance Petty as related to the Investigation Report of Chief of Police Jennifer Howell," and stated that "Petty's related employment actions and materials, all evidence related to the report, . . . and any and all public records were to be presented, discussed and considered." Dkt. 39-15 at 2. Petty did not attend the meeting. He believed the meeting was supposed to "be ordinary policy debate" and "did not receive an invitation or instruction to present evidence to clear his name." Dkt. 39 at 16. Petty also claims he was not given "reasonable written notice of the specific charges asserted as 'cause' under the Employment Agreement" and was not given "a meaningful pre-termination opportunity to respond." *Id.* at 15.

The City Council has five members: four City Councilmembers and the Mayor. Prior to the vote, Mayor Cain asked the City Attorney about the Agreement's super-majority requirement. According to Petty, the City Attorney "stated in substance that the supermajority provision did not matter because the City Charter required only a majority." *Id.* at 16. At the June 11, 2025 Special Meeting, in a 3-1 vote, the City Council terminated Petty's employment for cause,

citing "insubordination, gross and willful negligence against the City as well as creating a hostile workplace." Dkt. 39-15 at 6.

On June 19, 2025, Petty's counsel "spoke by telephone with Mayor Jerry Cain and requested that the City provide [Petty] a public name-clearing opportunity to respond to the accusations that had been publicly tied to his termination." Dkt. 39 at 18. Mayor Cain denied the request, "stating that the Council's decision was final and that the City would not revisit the matter." *Id.* at 19. According to Petty, the "City did not place a name-clearing hearing on an agenda, did not provide [Petty] with a public opportunity to respond to the stigmatizing charges, and did not correct or supplement the public record." *Id.*

Because of Peña's social media posts and recordings, Petty alleges that he was denied four different municipal employment opportunities. *See* Dkt. 39-3 at 2. Petty ultimately accepted employment at Turbeville Construction, where he makes "less than 61%" of his City Manager salary, with no health, vision, or dental benefits. *Id.*

From "June 2025 through at least July 2025," Petty alleges that Peña published "statements and videos to official-branded accounts, including statements characterizing [Petty] as involved in serious criminal, corrupt, or professionally disqualifying conduct." Dkt. 39 at 19–20. In August 2025, Peña filmed Petty's new place of employment, Turbeville Construction, and published posts on Peña's City-branded Facebook page, "falsely suggest[ing] that [Petty] was involved in an 'illegal grift' concerning Turbeville Construction and the potential sale of City Hall." *Id.* at 20.

On September 15, 2025, Petty instituted this lawsuit. On December 3, 2025, Defendants moved to dismiss. *See* Dkt. 17. I recommended that Defendants' motion to dismiss be granted as to Petty's federal claims and that the court decline to exercise supplemental jurisdiction over Petty's remaining state law claims. *See* Dkt. 36. The court adopted my memorandum and recommendation and granted Petty's motion for leave to file an amended complaint. *See* Dkt. 38 at 2.

On July 16, 2026, Petty filed an amended complaint against the City and Peña. *See* Dkt. 39. Petty asserts three claims against the City and Peña under 42 U.S.C. § 1983: (1) Procedural Due Process—Deprivation of Contractual Property Interest in Severance and Termination Benefits; (2) Procedural Due Process—Liberty Interest/Stigma-Plus/Name-Clearing Hearing; and (3) First Amendment Retaliation Based on Amanda Petty's Protected Citizen Speech and Petty's Refusal to Suppress That Speech. Petty also asserts a standalone state law breach of contract claim against the City, and state law claims for defamation, tortious interference with prospective business relations, and intentional infliction of emotional distress against Peña. Defendants have moved to dismiss all claims. In response to the motion to dismiss, Petty does not oppose dismissal of (1) his procedural due process claims against Peña in his individual capacity, and (2) his official-capacity claims against Peña. *See* Dkt. 48 at 6.

## LEGAL STANDARD

### A. Motion to Dismiss

A defendant may move to dismiss a complaint when a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Conversely, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point

of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (cleaned up).

When evaluating a Rule 12(b)(6) motion, I accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 675 (5th Cir. 2020) (quotation omitted). I "do not, however, accept as true legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement." *Benfield v. Magee*, 945 F.3d 333, 336–37 (5th Cir. 2019) (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## B. 42 U.S.C. § 1983

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted). To state a claim under § 1983, Petty must "(1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

## C. Qualified Immunity

Government officials sued in their individual capacity under § 1983 are entitled to qualified immunity, which is "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established

statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016). It is a judicially created doctrine designed to avoid "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The doctrine arises from "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* (cleaned up).

At the motion to dismiss stage, "a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021) (cleaned up). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Again, both prongs must be satisfied, and courts may choose which prong to consider first." *Bernabe v. Rosenbaum*, No. 21-10396, 2023 WL 181099, at *1 (5th Cir. Jan. 13, 2023); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (Courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

"The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation omitted). While Supreme Court precedent "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). Existing precedent places statutory or constitutional questions beyond debate "*only* when [the district court] can 'identify a case where an officer acting under similar

circumstances was held to have violated'" a constitutional right. *Surratt v. McClarin*, 851 F.3d 389, 392 (5th Cir. 2017) (emphasis added) (quoting *Pauly*, 580 U.S. at 79) (cleaned up). "It is the plaintiff's burden to find a case in his favor that does not define the law at a 'high level of generality.'" *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass*, 814 F.3d at 732–33).

### D. *MONELL* LIABILITY

"In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that Congress intended § 1983 to apply to local government entities as well as to persons." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (cleaned up). The Fifth Circuit has explained the contours of *Monell* liability:

> Under the decisions of the Supreme Court and this court, municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom. *Monell* and later decisions reject municipal liability predicated on *respondeat superior*, because the text of section 1983 will not bear such a reading. Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability. The three attribution principles identified here—a policymaker, an official policy and the "moving force" of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself. Mistakes in analyzing section 1983 municipal liability cases frequently begin with a failure to separate the three attribution principles and to consider each in light of relevant case law.

*Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (cleaned up).

Official policy exists in two forms. "First, a plaintiff may point to a policy statement formally announced by an official policymaker." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010). Second, an official policy may "arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of*

*Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579). "A policy or custom is official only 'when it results from the decision or acquiescence of the municipal officer or body with "final policymaking authority" over the subject matter of the offending policy.'" *Peterson*, 588 F.3d at 847 (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). "State law determines whether a particular individual is a county or municipality final decision maker with respect to a certain sphere of activity." *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996).

A custom or policy can be shown by "a pattern of unconstitutional conduct . . . on the part of municipal actors or employees," or where "a *final policymaker* took a single unconstitutional action." *Zarnow*, 614 F.3d at 169. "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Id.* "Allegations of an isolated incident are not sufficient to show the existence of a custom or policy." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). To plausibly "plead a practice so persistent and widespread as to practically have the force of law, [Petty] must do more than describe the incident that gave rise to his injury." *Ratliff v. Aransas County*, 948 F.3d 281, 285 (5th Cir. 2020) (quotation omitted).

## ANALYSIS

### A. First Amendment Retaliation

Petty claims that Defendants retaliated against him based on his spouse's "protected citizen speech and civic association concerning matters of public concern." Dkt. 39 at 28. Petty also claims that he "had a protected First Amendment interest in supporting, associating with, and refusing to suppress his spouse's citizen speech and civic participation." *Id.* at 29.

#### *1. Retaliation Based on the Right of Intimate Association*

Petty has never been clear about the nature of his First Amendment retaliation claim, and I previously assumed "that Petty's spouse's speech can give

rise to Petty's First Amendment retaliation claim." *Petty v. City of Freeport*, No. 3:25-cv-00296, 2026 WL 2055186, at *5 (S.D. Tex. June 29, 2026). There is little support in the law, however, for a spouse's speech giving rise to a First Amendment retaliation claim unless the claim is tied to the right of intimate association. "Though the matter is not free from doubt, . . . a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First Amendment right of intimate association." *Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999).

The right of intimate association "serves to protect 'certain kinds of highly personal relationships . . . from unjustified interference by the State.'" *Singletary v. Brumley*, No. 97-30346, 1998 WL 546515, at *7 (5th Cir. Aug. 12, 1998) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984)). "Marriage fits within this type." *See Singletary*, 1998 WL 546515, at *7 (citing *Zablocki v. Redhail*, 434 U.S. 374, 383–86 (1978)).

To state a First Amendment retaliation claim based on the right of intimate association, Petty must show that "(1) he suffered an adverse employment action, (2) his interest in 'associating' outweighed [Defendants'] interest in efficiency, and (3) his protected activity was a substantial or motivating factor in the adverse employment action." *Hitt v. Connell*, 301 F.3d 240, 246 (5th Cir. 2002). Additionally, Defendants "can be held liable for violating a right of intimate association only if [Petty] shows an *intent to interfere* with the relationship [with his wife]." *Singletary*, 1998 WL 546515, at *7 (quoting *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1440 (10th Cir. 1990)). It is undisputed that Petty's termination was an adverse employment action. Petty cannot, however, satisfy the third element of causation. Nor can Petty demonstrate an intent to interfere with his marriage.

Petty has not alleged facts plausibly suggesting that his June 2025 termination by the City Council is connected to his wife's speech from October and December 2023. "Close timing between an employee's protected activity and an

adverse action against him may provide the causal connection required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (cleaned up). Eighteen months is not close timing. *See Benfield v. Magee*, 945 F.3d 333, 337–38 (5th Cir. 2019) (holding that defendants were entitled to qualified immunity at the motion-to-dismiss stage on the plaintiff's First Amendment retaliation claim because "a 19-month gap is too long to show causation by itself").

Moreover, Petty has not alleged facts remotely suggesting that the City Council—as opposed to Peña—was even aware of Amanda's speech. There is nothing in the complaint to suggest that Peña raised the issue of Amanda's speech at the June 11, 2025 Special Meeting. The agenda for the Special Meeting mentioned only Petty's dismissal "as related to the Investigation Report of Chief of Police Jennifer Howell." Dkt. 39-15 at 2. It said nothing about Amanda's speech. Nor did City Council discuss Amanda's speech when voting on whether to terminate Petty's employment. *See id.* at 6. Accordingly, Petty fails to state a First Amendment retaliation claim against the City.

As for Peña, Petty's claim also fails as to causation. It is simply implausible that Peña's efforts to terminate Petty's employment in June 2025 were motivated by Amanda's speech from 18 month earlier. I need not belabor the causation issue, however, because Peña is entitled to qualified immunity. It is Petty's "burden to find a case in his favor that does not define the law at a high level of generality." *Vann*, 884 F.3d at 310 (quotation omitted). Petty must "identify a case where an officer acting under similar circumstances was held to have violated" a constitutional right. *Surratt*, 851 F.3d at 392 (quoting *Pauly*, 580 U.S. at 552) (cleaned up). Petty does not identify *any* case in his response brief, much less a factually analogous case. *See* Dkt. 48 at 17–18. Accordingly, even if Petty could state a First Amendment retaliation claim based on Petty's right to intimate association with his wife, Peña is entitled to qualified immunity because his actions did not violate clearly established law.

### 2. *Retaliation Based on Petty's Response to Peña's Threats*

To the extent Petty would argue that the speech at issue was Petty's *response* to Peña's threats, "[t]he question, for First Amendment purposes, is whether [Petty] was being ordered to endorse or support [Peña]'s positions on the issues on which [Amanda] opposed [Peña]." *Singletary*, 1998 WL 546515, at *6. To state such a claim, Petty must allege: (1) "an adverse employment action"; (2) that Petty's response to Peña's threats "involved a matter of public concern"; (3) that Petty's "interest in commenting on matters of public concern outweighs the [City]'s interest in promoting efficiency"; and (4) that Petty's response to Peña's threats motivated the adverse employment action. *Modica v. Taylor*, 465 F.3d 174, 180 (5th Cir. 2006).

As to the City, there is nothing in the record to suggest that City Council was even aware of Peña's threats to Petty. Petty argues that the City is liable because the City "ratified or adopted [Peña's] retaliatory use of official-branded channels and allegations as part of the termination process." Dkt. 39 at 31. "[L]iability may . . . occur when the municipality's policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees." *Santibanes v. City of Tomball*, 654 F. Supp. 2d 593, 611 (S.D. Tex. 2009) (citing *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990)). "But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Accordingly, the City cannot be liable for Peña's threats to Petty.

As for Peña, I will assume, for the sake of argument, that Petty can state a First Amendment retaliation claim against Peña. Even so, Peña is entitled to qualified immunity for the same reasons discussed above. Petty's failure to "identify a case that would show how the right in question was clearly established

at the time of the violation . . . dooms his case." *Lowry v. City of La Marque, Tex.*, No. 3:22-cv-00112, 2025 WL 1195561, at *3 (S.D. Tex. Apr. 24, 2025) (quotation omitted), *aff'd sub nom. Lowry v. City of La Marque*, No. 25-40519, 2026 WL 1975731 (5th Cir. July 8, 2026).[2]

## B. STIGMA-PLUS PROCEDURAL DUE PROCESS CLAIM AGAINST THE CITY

Petty claims that the City violated his procedural due process rights when the "City failed to schedule a name-clearing hearing, failed to respond to the name-clearing request after the original request, failed to provide [Petty] with a public opportunity to respond to the charges, and failed to correct the public record." Dkt. 39 at 27. This is commonly referred to as a "stigma-plus" procedural due process claim. The Fifth Circuit has articulated a seven-pronged test for stating such a claim:

> To succeed on [a] § 1983 claim for the denial of a name-clearing hearing, the employee must prove the following: [1] that he was discharged, [2] that defamatory charges were made against him in connection with the discharge, [3] that the charges were false, [4] that no meaningful public hearing was conducted pre-discharge, [5] that the charges were made public, [6] *that he requested a hearing in which to clear his name*, and [7] that the request was denied.

*Rosenstein v. City of Dallas*, 876 F.2d 392, 395–96 (5th Cir. 1989) (emphasis added), *opinion reinstated in part*, 901 F.2d 61 (5th Cir. 1990).

I previously recommended dismissal of this claim "[b]ecause Petty fail[ed] to allege the sixth prong—that he requested a name-clearing hearing." *Petty*, 2026 WL 2055186, at *4. In his amended pleading, Petty now alleges that he requested a name-clearing hearing on June 19, 2025, when his counsel spoke to Mayor Cain. Dkt. 39 at 18. I will assume, for the sake of argument, that Petty can make out every

---

[2] It is doubtful that Petty could have provided such a case even if he tried. "Although 'third party standing' exists in certain circumstances, the district court cited no decisional authority, and we are aware of none, to suggest that a right to raise a First Amendment claim based on a third party's 'public concern' speech was 'clearly established' for qualified-immunity purposes." *Burge v. Pearl River County*, 103 F. App'x 823, 826–27 (5th Cir. 2004) (cleaned up).

element of his stigma-plus claim, and that Petty's counsel's request to Mayor Cain satisfies the sixth prong. Even so, the City cannot be held liable for such a violation because Mayor Cain's denial is not City policy.

"The city is liable for the action of the official responsible for establishing policy with respect to the matter." *Rosenstein*, 876 F.2d at 397. In *Rosenstein*, the plaintiff, a police officer, was denied a name-clearing hearing despite the Chief of Police and the Assistant City Manager being aware of his request for one. *See id.* at 396–97. The Fifth Circuit held that the City was liable because the Chief of Police "set all of the policies for the police department" and the Assistant City Manager "had supervisory responsibility for the police department." *Id.* at 397. By contrast, there are no allegations here "that the city council had delegated policy-making authority to the [individual] who denied him a name-clearing hearing"—Mayor Cain. *Id.*

Petty himself recognizes that City Council—not Mayor Cain—is the City's final policymaker. *See* Dkt. 39 at 24 (stating that City Council is the "final policymaker for the employment action and deprivation at issue"). According to Petty, Mayor Cain denied Petty's counsel's request for a name-clearing hearing during the same telephone call in which Petty's counsel requested the hearing, without consulting City Council. *See id.* at 27. Because Mayor Cain is not the City's final policymaker, and because Mayor Cain denied the request without consulting City Council, Mayor Cain's denial was not an official policy of the City. Because Petty cannot establish *Monell* liability for the City for his stigma-plus procedural due process claim, that claim should be dismissed.

### C. Procedural Due Process Claim Against the City Based on Deprivation of Contractual Property Interest

According to Petty, the City deprived him of his property interest in his $50,000 severance payment "without due process by terminating him for cause without reasonable written notice of the specific charges, without timely access to the materials used against him, without a meaningful opportunity to respond, and

without the contractual supermajority vote." *Id.* at 23–24. Procedural due process claims "require two inquiries: (1) 'whether there exists a liberty or property interest which has been interfered with by the State' and (2) 'whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 228–29 (5th Cir. 2020) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

I will assume, without deciding, that Petty has a property interest in the severance payment he would have received had he not been terminated for cause. Even so, Petty does not have a procedural due process claim against the City because that property interest "can be fully protected by an ordinary breach-of-contract suit." *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001). The Texas Supreme Court has had that the Local Government Contract Claim Act waives a local governmental entity's immunity from suit for breach of an employment contract. *See Damuth v. Trinity Valley Cmty. Coll.*, 450 S.W.3d 903, 903–05 (Tex. 2014) (citing Tex. Loc. Gov't Code § 271.151(2)).[7] Because Texas "makes ordinary judicial process available to [Petty] for resolving [his] contractual dispute [with the City], that process is due process." *Lujan*, 532 U.S. at 197.

### D. THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PETTY'S STATE LAW CLAIMS

Having established that Petty fails to state a claim under federal law, I recommend that this court decline to exercise supplemental jurisdiction over Petty's state law claims for breach of contract, defamation, tortious interference with business relations, and intentional infliction of emotional distress, and "dismiss [those claims] without prejudice." *Duncan v. City of Freeport*, No. 3:23-cv-00255, 2024 WL 28119118, at *4 (S.D. Tex. Jan. 23, 2024) (citing 28 U.S.C. § 1367(c)(3)).

---

[7] A suit against the City for breach of contract can be brought only in state court, however, because Texas law "does not waive sovereign immunity to suit in federal court." Tex. Loc. Gov't Code § 271.156.

**CONCLUSION**

For the reasons discussed above, I recommend that Defendants' motion to dismiss (Dkt. 53) be granted as to Petty's federal claims and that those claims be dismissed with prejudice. I further recommend that the court decline to exercise supplemental jurisdiction over Petty's remaining state law claims for breach of contract, defamation, tortious interference with business relations, and intentional infliction of emotional distress, and dismiss those claims without prejudice.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 20th day of November 2026.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE